Equitable Powder Manufacturing Co. v. Walter Green,
by His Next Friend.

1. Master and Servant—*When an Order to Continue Work with a Defective Machine is Not a Waiver of Servant's Assumption of Risk.*
—Where an order to continue work, with a promise to sharpen a punch, is made by the master without notice or knowledge that the work had become extra hazardous on account of the punch being dull, and its being dull does not reasonably suggest to a reasonably competent master that on this account the work has become extra hazardous, an order to go back to work is not a waiver of an assumption by plaintiff of any risk on account of the punch being dull.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Madison County; the Hon. Benjamin R. Burroughs, Judge presiding. Heard in this court at the February term, 1903. Reversed and remanded. Opinion filed June 15, 1903.

Appellee, a minor aged eighteen years, brought suit by his next friend against appellant, for $1,950.

The declaration contains four counts. At the close of appellant's evidence, upon motion of appellant, the court directed the jury to disregard the first, third, and fourth counts. At the close of all the evidence, appellant made a motion to instruct the jury to find for defendant, which motion was overruled. The jury returned a verdict for $350, upon which the court rendered judgment and defendant appealed.

The substance of the second count, after proper inducements, is, that appellee was employed in running a cutting press which cut can heads for powder cans from metal sheets by a punch or die; that it was necessary to sharpen said punch once or twice a day so that it could be operated safely; that it was defendant's duty to sharpen said punch when necessary, and to keep it in reasonably safe order; that while plaintiff was using said cutting press, said punch became dull, rendering the press dangerous to work with; that plaintiff notified Jesse Amos, the superintendent under whom he worked and whose duty it was to keep said punch sharp, that the same was dull and needed to be sharpened; that said Amos ordered plaintiff back to work until he

could go to the machine and sharpen the punch, and said that he would do this in a short time; that plaintiff, relying on said promise, returned and began to operate the machine, and that in a few minutes said punch, owing to its dull condition, failed to completely sever a can head from the metal sheet, as it would have done if properly sharpened, whereby the plaintiff, using due care, while trying to remove this can head, had his left hand cut and lacerated, etc.

Defendant pleaded the general issue.

WISE & McNULTY, attorneys for appellant.

TRAVOUS, WARNOCK & BURROUGHS, attorneys for appellee.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

Appellant was operating a factory which made powder cans. Appellee, then eighteen years old, had been working in the factory for several months, in different kinds of work, including tending a cutting machine which, by a stamp or die, punched out heads for the cans from a thin sheet of metal. Twelve heads could be punched from one sheet of metal. Appellee would place the sheet under the stamp and remove the can head when punched out. The punch, when in constant use, required to be sharpened generally each day. When dull it left the edges of the can head rough and ragged. Jesse Amos, the machine superintendent, looked after the sharpening of the punches and testifies that he examined them in the morning of each day and sharpened them when necessary. About ten A. M., on March 16th, appellee testifies that he saw that the punch of the machine which he was working left a ragged edge on the can heads; that he told Amos, the superintendent, that the machine was dull and that he would like to have it sharpened; that Amos directed him to continue at work and that he would sharpen it in a few minutes; that he returned to work and after punching out a few heads, cut his thumb on a sharp edge or sliver. It is not clear from appellee's testimony in chief whether his thumb was cut in moving

the sheet of metal or in taking up a can head that had been stamped from the sheet. In his cross-examination, when illustrating with a can head in his hand, his testimony indicates that he took hold of the can head to remove it and cut his thumb from a sharp edge or projection on the under side of the head. Much importance is given to this by counsel for appellant, the evidence introduced for appellant tending to show that the ragged edge or projecting slivers caused by a dull punch would be on the upper instead of the lower edge of the can head. Appellee further testifies that the sliver or sharp point which cut his thumb was about half an inch long, a little larger on one end than the other; it extended from the lid and ran to a point; that he showed his thumb to Amos, and wrapped it up in a piece torn from his handkerchief; that it bled during the day, but he continued working until five o'clock; that when he sat down at the supper table that evening he got sick and laid down on a couch; that he became unconscious and remained so until the next morning, when he regained consciousness; that he doctored with Dr. Pence this Saturday evening until Monday evening, when he went to Jerseyville; that Dr. Berry then attended him.

Dr. Berry testifies to treating the thumb from March 18th; that blood poisoning set in, requiring several lancings and treatment at the house until March 31st, and subsequently at his office.

There are material contradictions of appellee's evidence. Jesse Amos testifies:

"I never saw plaintiff there with a bleeding thumb; he never came to me on the 16th of March, or at any time when working there, and told me that the die press was getting dull, and wanted me to sharpen it; I never told him at any time while he was working there to go ahead and I would be there in a few minutes." Witness further testified: "The first I knew he got hurt or sick was because he went to Jerseyville. I met him one evening as he was going home; he complained of his arm; said he had cut his thumb; it looked like it had been cut with the small blade of a knife; didn't see any more of him for about a week, when he came back and went to work on a stopper machine. He

worked on that about a day and a half until I got the heading press ready for him.    He worked there from ten o'clock until evening.    He looked pale and weak, and showed me this cut again, and it looked like it was swollen up.    I paid no attention to it, because it was a common thing to get your fingers cut.    The next day he didn't show up."

Dr. Pence testifies that on the evening of March 2d he treated plaintiff at his house for a pain in the bowels; that he was unconscious; that he saw him on the next day when he complained of his finger; that he saw no laceration; that the charge on his book and the date of the prescription at the drug store, and his recollection, all agree to the date as the 2d of March; that he has no recollection of treating him on the 16th of March.

Other witnesses corroborate appellee as to the date when Dr. Pence trea ted him and the date when he went to Jerseyville.

There is also some conflict as to how soon blood poisoning would follow a cut on the thumb, and evidence tending to show that unconsciousness from such an injury, occasioned by blood poisoning, would not occur in the evening of the day when the injury was received.

The evidence for appellee, if true, is sufficient to sustain the allegations as to the manner in which appellee was injured, the date and extent of his injury, the notice given to the superintendent and his order to continue work. This being so, and the evidence conflicting, these allegations must be held as sufficiently proved.    If the case rested solely upon the finding of the jury upon these issues, the verdict of the jury, under well established precedents should be accepted as conclusive.

But a mixed issue of law and fact is also involved. Assuming that appellee did notify the superintendent, and that the superintendent did reply, as appellee testifies, was this such a notification and promise as entitles appellee to recover in this action ?

Appellee bases his right of recovery upon the ground that when he saw that the punch was dull and was leaving a ragged edge on the lids, he notified Amos, the superin-

tendent, and that he ordered him to continue at work, promising to come in a few minutes and sharpen it; that by obeying this order and continuing at work, he did not assume the risk of working with a dull punch.

In considering what was the character of appellee's notice to the superintendent, as bearing upon this mixed issue of law and fact, the testimony of appellee is here given literally as shown by the record, the superintendent testifying positively that no notice was given.

Q. If you were cutting out those heads, what, if anything, did you discover with reference to the machine being dull? A. I seen it would leave a ragged edge on the can heads.

Q. How do you mean it does when dull? A. Well, it leaves it rough and don't cut smooth.

* * * * * * *

Q. What did you do when you discovered that? A. I went and told Jesse Amos it was dull.

* * * * * * *

Q. What would you do when the machine got dull? who would sharpen it? A. Jesse Amos, he would sharpen it.

Q. What did he tell you, if anything, with reference— A. I told him the machine was dull and he told me to go back and work just a little while and he would be back and sharpen it. He told me if I noticed the machine getting dull to tell him, but as a general thing he noticed it himself and sharpened it.

Cross-examination:

Q. Now what was the exact language you used to Jesse Amos on this morning when you got hurt? A. Well, I can't tell the exact words.

Q. Give it the best way you can; give it as you remember it; the nearest you can. A. Well, I told him the machine was dull and I would like for it to be sharpened.

Q. That is all you said, and he told you that he would be there in a few minutes, to go ahead, he was busy? A. Yes, sir.

Q. Is that all you said? A. That is all I know of.

If this is all that was said by either appellee or Amos, does it indicate that either of them contemplated that appellee's work had become extra hazardous, or that appellee

continued to work because Amos promised to sharpen the punch?

What is said in Chicago Bridge & Iron Co. v. Hayes, 91 Ill. App. 271, is applicable to the present case.

"There is not a word that the appellee or superintendent contemplated any additional danger from the claimed defect. * * * There was no complaint or promise to eliminate any danger. * * * The purpose and legal effect of a promise by the employer to repair defective implements or machinery is to relieve the employe of the assumption by him of a risk that he would otherwise be chargeable with."

When the servant continues to work with machinery that he believes to be out of repair and thereby unsafe, without notifying the master, he assumes the risk of so working. He may give notice of machinery being so out of repair, that it does not do its work properly, and yet have no apprehension that it is thereby unsafe.

In Tesmer v. Boehm, 58 Ill. App. 610, while recognizing the rule that the servant continuing to work under a promise to repair dangerous machinery does not assume the risk of its being out of repair, it is said:

"But what application has the rule to a case where neither master nor servant contemplated any additional danger to the servant in the use of the defective instrument, but only imperfection in the work done with it?"

The nature of the needed repair may be of such a character as to excite no reasonable apprehension of increased risk in the mind of either the servant or the master.

If the order to continue work, with a promise to sharpen the punch, was made by the superintendent without notice or knowledge that the work had become extra hazardous on account of the punch being dull, and if its being dull did not reasonably suggest to a reasonably competent superintendent that on this account the work had become extra hazardous, then an order to go back to work was not a waiver of an assumption by appellee of any risk on account of the punch being dull.

There is nothing in the testimony of appellee that

indicates that either he or the superintendent apprehended increased danger on account of a dull punch. Appellee told the superintendent that the machine was not doing its work properly and told him why. This was all the notification that appellee gave. There is nothing in appellee's testimony indicating any intention of quitting work on account of the danger from a dull punch if not sharpened.

In Bodwell v. Nashua Mfg. Co., 70 New Hampshire, 390, it is said:

" There was no evidence that the plaintiff suggested that the escape of the steam made his work more dangerous or that he thought of quitting the employment unless repairs were made. The promise to repair was not shown to have any connection with plaintiff's continuing in the employment. No case has gone so far as to hold that where the servant does not complain on his own account, with full knowledge of the risk, he can recover of the master because the latter, when the defective condition was called to his attention by the servant, gave assurances which did not induce the servant to remain, that the defect would be remedied. To this same effect are Lewis v. N. & N. E. Ry. Co., 153 Mass. 73; Cantwell v. John Brennan & Co., 125 Mich. 349."

Applying this doctrine to the case at bar, we think that the evidence fails to prove that either appellee or the superintendent apprehended any increased danger by reason of a dull punch, nor is there any evidence that appellee continued to work by reason of the superintendent's promise to sharpen it. The evidence does show that appellee, as well as other operatives, had been cut and scratched before, and that this was not uncommon. It was one of the ordinary and natural risks assumed by workmen handling sharp-edged pieces of thin sheet iron.

The evidence to support appellee's allegations of any promise to repair depends upon his testimony alone, and this testimony is squarely contradicted by the testimony of the superintendent.

Assuming appellee's testimony to be true, we do not think that it proves a promise to repair in view of dan-

ger anticipated by either appellee or the superintendent, or that appellee continued to work in consequence of such promise.

Whether or not there are other witnesses who may throw more light upon this issue does not appear.

The judgment of the Circuit Court is therefore reversed and the case remanded.